DECISION
{¶ 1} Relator, Virgil P. Bentley, Jr., has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order terminating relator's permanent total disability ("PTD") compensation, finding that all compensation paid had been overpaid and was recoupable under the fraud provisions of R.C. 4123.511(J), and ordering the commission to find that he is entitled to further receipt of PTD compensation.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court grant relator's request for a writ of mandamus. (Attached as Appendix A.) The commission has filed objections to the magistrate's decision.
 {¶ 3} Much of the commission's argument centers around its contention that relator failed to reveal to his doctors and the commission that he had worked as a van driver for Washington Courthouse City School District for one hour per day from July 19, 2002 through December 20, 2002, a period for which he was retroactively paid PTD benefits. The commission's contentions, in this respect, are difficult to find persuasive, as the commission was aware that relator may have worked during this period. In the commission's August 6, 2002 statement of facts, the commission specifically acknowledged that relator had been, and may still have been, employed in this capacity. Notwithstanding, the commission claims relator lied in his June 5, 2003 questionnaire when he indicated he had not worked since he was granted PTD benefits. However, the order granting PTD compensation was not mailed until December 31, 2002. Thus, relator's answer was truthful insofar as the question seems to ask if he had worked since the date the commission actually granted benefits rather than since the date to which the commission retroactively granted benefits. The commission also claims relator lied to his doctors about his employment. However, the commission originally granted PTD based upon the report of Dr. Kevin Lake. During the fraud investigation, relator indicated he told his doctors about his employment, and there is nothing in Dr. Lake's report that would contradict relator's claim. In addition, despite the commission's arguments to the contrary, the magistrate did not shift the burden to the commission by pointing out that the commission never asked relator at the PTD hearing whether he had been working during this period. Rather, the magistrate was merely noting that the commission's contention that relator intentionally lied is difficult to maintain when relator was never asked a question on the issue at the hearing. Therefore, we find these arguments without merit.
 {¶ 4} The real crux of the matter, as addressed by the magistrate, was whether relator was performing sustained remunerative employment by working as a van driver during the period he received retroactive PTD compensation. The commission argues that the magistrate erred in finding that relator was not performing sustained remunerative employment under these circumstances. The commission notes that relator was paid for his time as a van driver and worked consistently from July 19, 2002 through December 20, 2002. However, as the magistrate found, the employment involved was not medically inconsistent with relator's medical restrictions, was only for 30 minutes before school and 30 minutes after school, and involved the use of only his left hand, not his right hand, the use of which was severely limited. We believe the magistrate's findings, in this respect, were consistent with the Ohio Supreme Court's decision in State exrel. Lawson v. Mondie Forge, 104 Ohio St.3d 39, 2004-Ohio-6086, in that relator's activities as a van driver did not constitute actual sustained remunerative employment, did not demonstrate the physical ability to perform sustained remunerative employment, and were not so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. See id. at ¶ 15-16. Therefore, the commission's argument, in this respect, is also without merit.
 {¶ 5} After an examination of the magistrate's decision, an independent review of the evidence, pursuant to Civ.R. 53, and due consideration of the commission's objections, we overrule the objections and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and grant relator's request for a writ of mandamus.
Objections overruled; writ of mandamus granted.
Petree and McGrath, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Virgil P. Bentley, Jr.,: Relator, : :
v. : No. 05AP-336 :
Industrial Commission of Ohio : (REGULAR CALENDAR) and Building Technologies Corp., : Respondents. :
 MAGISTRATE'S DECISION Rendered on September 16, 2005 Philip J. Fulton Law Office, and Jacob Dobres, for relator.
Jim Petro, Attorney General, and Charissa D. Payer, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 6} Relator, Virgil P. Bentley, Jr., has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating relator's permanent total disability ("PTD") compensation, finding that all compensation paid had been overpaid and was recoupable under the fraud provisions of R.C. 4123.511(J), and ordering the commission to find that he is entitled to further receipt of PTD compensation.
Findings of Fact:
 {¶ 7} 1. Relator sustained a work-related injury on June 17, 1991, and his claim has been allowed for "contusion right upper arm; tear of pectoralis major muscle right; depression."
 {¶ 8} 2. Relator filed an application for PTD compensation in April 2000, and the matter was heard before a staff hearing officer ("SHO") on November 21, 2000. The SHO noted that relator had severe restrictions relative to his right upper extremity and that he was essentially limited to using his left upper extremity to perform work. The SHO further found that relator had the ability to be retrained and noted further as follows:
Inspite [sic] of this difficulty, claimant found it within himself to seek out work driving a handicapped child to and from school. Per claimant's own testimony, he physically was able to do the job but left only when he became concerned of the potential fallout the school board would face if claimant was ever involved in an accident while driving this van with his one good (left) arm.
 {¶ 9} 3. Relator filed his second application for PTD compensation in June 2002. On that application, relator indicated that he had graduated from high school, could read and write, and perform basic math, but not well.
 {¶ 10} 4. The record contains the July 19, 2002 report of Kevin B. Lake, D.O., who opined that relator was permanently and totally disabled from any type of sustained remunerative/gainful employment and that he would never return to any type of sustained remunerative employment.
 {¶ 11} 5. The record also contains the September 18, 2002 report of commission specialist Timothy J. Fallon, M.D., who opined that relator had reached maximum medical improvement ("MMI") and assessed a five percent whole person impairment. Dr. Fallon concluded that relator could perform alternative sedentary employment.
 {¶ 12} 6. The record also contains the September 27, 2002 report of Donald J. Tosi, Ph.D., who examined relator for his allowed psychological conditions. Dr. Tosi opined that relator had reached MMI, assessed a 20 percent whole person impairment and concluded that, from a psychological standpoint alone, relator could return to his former position of employment or any other employment for which he was otherwise qualified.
 {¶ 13} 7. An employability assessment report was prepared by Michael A. Klein, Ph.D. Based upon the report of Dr. Lake, Dr. Klein opined that relator was not employable. However, based upon the reports of Drs. Fallon and Tosi, Dr. Klein listed several jobs which relator could immediately perform or perform after appropriate academic remediation or brief skill training. Dr. Klein noted that relator's age would not be a limiting factor in terms of his re-employment potential, that his education would be sufficient for re-entry into the workforce, and that relator's long work history would be a positive factor but may require remediation.
 {¶ 14} 8. The matter was heard before an SHO on December 17, 2002. The SHO specifically noted relator's previous application TTD application as follows:
* * * Claimant was previously denied permanent total disability by Industrial Commission order dated 11/21/2000. Claimant returned to employment after his surgical procedures as a van driver for a handicapped child. Per the claimant's testimony, he was capable of performing this position, but terminated his employment when he became concerned due to the potential fall out the school board would face if he was ever involved in an accident driving this van.
 {¶ 15} 9. Thereafter, the SHO relied upon the medical report of Dr. Lake and found that relator was entitled to PTD compensation. In the alternative, the SHO relied upon the reports of Drs. Fallon and Tosi but noted that relator:
* * * [W]ould be restricted to much less than a full range of sedentary activities. The claimant has virtually lost use of his right upper extremity which was his dominant one. Furthermore, the claimant is now 60 years of age. The combination of these factors leads the Hearing Officer to believe that the range of sedentary employment positions the claimant would be capable of performing would be very minimal. In addition, pursuant to the 10/28/2002 vocational report of Michael A. Klein, Ph.D., the claimant's adjusted worker trait profile demonstrates an individual with average to below average aptitudes including a negligible rating in his clerical perceptions as he has had very little interaction with clerical activities over his working career. The Staff Hearing Officer finds most if not all sedentary positions require at least some if not all clerical functions. Furthermore, the claimant's general educational development demonstrates an individual with exceedingly low levels of math and language skills. Therefore, combining these facts with an individual who essentially has only one useful upper extremity which is his non-dominant extremity, the Staff Hearing Officer finds that the claimant would not be capable of performing even alternative sedentary employment and therefore, his application for permanent total disability is hereby GRANTED.
(Emphasis sic.)
 {¶ 16} 10. The SHO determined that PTD compensation was payable beginning July 19, 2002, the date of Dr. Lake's report. Relator had been present at that hearing and the findings were mailed December 31, 2002.
 {¶ 17} 11. Some time in May 2003, the Ohio Bureau of Workers' Compensation ("BWC") learned that Washington Courthouse City Schools had reported wages for relator during the third and fourth quarters of 2002. Because relator had received PTD compensation since July 19, 2002, the matter was referred to the BWC's Special Investigations Unit ("SIU") for investigation.
 {¶ 18} 12. Based upon the SIU investigation, it was determined that:
[One] BENTLEY had worked as a part-time van driver, 8:30 a.m. to 9:00 a.m. and 3:00 p.m., to 3:30 p.m., Monday through Friday, from 4-3-1995 to 12-20-2002, excluding holidays and summer breaks.
[Two] BENTLEY was paid bi-weekly and earned $3,526.79 in 2002.
[Three] BENTLEY consistently worked from the week ending 8-23-2002 to the week ending 12-20-2002 as he was credited for a total of eighty-three [83] days of employment.
(Emphasis sic.)
 {¶ 19} 13. During the interview section of the report, it was noted that relator admitted that he worked for Washington Courthouse City Schools as a van driver until the time he learned he had been granted PTD compensation. Furthermore, relator indicated that he had informed everyone, including the BWC and his examining physicians, that he was driving for Washington Courthouse City Schools.
 {¶ 20} 14. Based upon the SIU investigation, the BWC filed a motion to terminate relator's PTD compensation, asked the commission to declare an overpayment of PTD compensation, and requested the commission make a finding of fraud.
 {¶ 21} 15. The BWC's motion was heard before an SHO on May 5, 2004. The SHO specifically noted the earlier application for PTD compensation which was denied by order dated November 21, 2000, and noted:
* * * One of the key elements in this denial was the Staff Hearing Officer finding that the claimant, "found it within himself to seek out work driving a handicap child to and from school. Per claimant's own testimony, he physically was able to do the job but left only when he became concerned of the potential fallout the school board would face if claimant was ever involved in an accident while driving this van with his one good (left) arm."
 {¶ 22} 16. The SHO then went on to find that relator was not entitled to PTD compensation, declared an overpayment and made a finding of fraud as follows:
The findings of the investigation report demonstrate that the injured worker was engaged in part-time work over a period for which he was retroactively awarded permanent total disability compensation, over a period during which he was undergoing independent medical examinations with respect to his application to be awarded permanent total disability compensation, and that he repeatedly made statements, inconsistent with his activities, or at least failed to disclose them when asked. There are to [sic] many examples for this to be a mere misunderstanding. This is particularly true in light of the direct statement on the application in handwriting that the claimant had not worked over that period, when it has been demonstrated that he did work part-time. Additionally, it is plain that the claimant was questioned about his activities by the Staff Hearing Officer at the hearing of 12/17/2002, and that the claimant did not respond truthfully to these questions.
In reaching this determination the Staff Hearing Officer has considered the evidence of record relevant to the issue of permanent total disability. Particular consideration was given to the evidence cited by the Staff Hearing Officer in the order of 12/17/2002 in granting the award, from physicians who did offer opinions of quite substantial impairment. These physicians were not aware of the extent of the claimant's activities when they reached there [sic] conclusions. Permanent total disability is an inability to engaged [sic] in any form of sustained remunerative employment, including part-time work. Permanent total disability compensation is a compensation of last resort. The fact that the claimant was engaged in part-time work at the time of those examinations would have been more than marginally material to the physicians in reaching their opinions. The Staff Hearing Officer must agree with the Administrator's position that the medical evidence which supports the award of permanent total disability compensation made by order of 12/17/2002 was so deeply flawed by the fact that the claimant did not advise those physicians that he was working that that medical evidence cannot be relied upon.
The Staff Hearing Officer invokes the continuing jurisdiction of the Industrial Commission Revised Code Section 4123.52 and in case of fraud. The award was based on unreliable medical evidence and false statements concerning the injured worker's activities. The permanent total disability compensation award commencing 07/19/2002 is vacated, and all compensation paid under that award is held to be overpaid, and to be recoupable under the fraud provisions of Revised Code Section 4123.511(J).
There are six elements to a finding of fraud. For a finding of fraud it must be demonstrated that the claimant made a representation, or where there is a duty to disclose, a concealment of fact. The statements made by the claimant at hearing, on his permanent total application, and to the physicians who examined him with respect to that permanent total application, were representations. The fact of the claimant working is a representation material to the transaction at hand. Permanent total disability compensation can not be paid to a person who is working, and is not properly payable to a person who is able to work. The statements were made falsely and with knowledge of their falsity, as the claimant must have been aware that he was working at the time that he made statements that he was not. The claimant must have been intent upon misleading the physicians, and hearing officer, in making those statements. The award of compensation could not have been made over periods when the claimant was working and consequently there was justifiable reliance upon the representation, and lastly, the payment of compensation resulted in the injury of improper payment of compensation to which the injured worker was not entitled. Each of the 6 elements of fraud has been met.
 {¶ 23} 17. Thereafter, relator filed the instant mandamus action in this court.
Conclusions of Law:
 {¶ 24} The real question which arises from this action is whether or not the commission abused its discretion in terminating relator's PTD compensation, declaring an overpayment, and finding that overpayment could be recouped pursuant to the fraud provisions of the Ohio Revised Code. Relator also asserts that, the interviews conducted by the SIU investigators violated relator's due process rights, are not fundamentally fair, and are therefore unconstitutional. For the reasons that follow, the magistrate finds that relator is entitled to a writ of mandamus.
 {¶ 25} A claimant's capacity for any sustained remunerative work is the relevant issue in a PTD determination. State ex rel.Lopez v. Indus. Comm. (1994), 69 Ohio St.3d 445; State ex rel.Domjancic v. Indus. Comm. (1994), 69 Ohio St.3d 693.
The character of a permanent total disability award does not, however, mean that the award is completely immune from later review. If, for example, the commission learns that the claimant is working or engaging in activity inconsistent with his permanent total disability status, the commission can use its continuing jurisdiction under R.C. 4123.52 to reopen the matter. * * *
State ex rel. Smothers v. Mihm (1994), 69 Ohio St.3d 566,567-568.
 {¶ 26} Recently, in State ex rel. Lawson v. Mondie Forge,104 Ohio St.3d 39, 2004-Ohio-6086, at ¶ 15-16, 19-21, the court had occasion to clarify the standard for terminating PTD compensation when it is alleged that the compensation's recipient had engaged in activities inconsistent with the receipt of the award:
* * * [A] critical issue * * * has always lurked in the periphery of the PTD debate: How active can a person be and still be deemed eligible for PTD?
PTD pivots on a single question: Is the claimant capable of sustained remunerative employment? State ex rel. Stephenson v.Indus. Comm. (1987), 31 Ohio St.3d 167[.] * * * Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, State ex rel. Kirby v. Indus. Comm.,97 Ohio St.3d 427, 2002-Ohio-6668 * * *; (2) the physical ability to do sustained remunerative employment, State ex rel. Schultzv. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316 * * *; or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. SeeState ex rel. Timmerman Truss, Inc. v. Indus. Comm.,102 Ohio St.3d 244, 2004-Ohio-2589 * * *, ¶ 26.
* * *
Neither "sustained" nor "work" has been conclusively defined for workers' compensation purposes. As to the latter, clearly, labor exchanged for pay is work. Schultz also teaches that unpaid activity that is potentially remunerative can be considered for purposes of establishing a physical capacity for remunerative employment. This principle, however, should always be thoughtfully approached, particularly when PTD is at issue.
One of the most enduring (though not often explicitly stated) misconceptions about PTD is that once it is granted, the recipient must thereafter remain virtually housebound. This is a fallacy. PTD exempts no one from life's daily demands. Groceries must be purchased and meals cooked. Errands must be run and appointments kept. The yard must be tended and the dog walked. Where children are involved, there may be significant chauffeur time. For some, family and friends shoulder much of the burden. Others, on the other hand, lack such support, leaving the onus of these chores on the PTD claimant.
These simple activities can nevertheless often generate considerable controversy. That is because all of these tasks are potentially remunerative. From the school cafeteria to the four-star restaurant, people are paid to prepare meals. People are paid for lawn and child care. Many people earn their living behind the wheel. State ex rel. Parma Comm. Gen. Hosp. v.Jankowski, 95 Ohio St.3d 340, 2002-Ohio-2336 * * *, acknowledged this and cautioned against an automatic disqualification from compensation based on the performance of routine tasks, regardless of their potential for payment. We instead compared the activities with claimant's medical restrictions to determine whether they were so inconsistent as to impeach the medical evidence underlying the disability award.
 {¶ 27} In the present case, the medical evidence establishes that relator, a predominately right hand dominant individual, has severe limitations relative to the use of his right arm. This fact is not in dispute. Furthermore, it is undisputed that, when his April 2000 application for PTD compensation was denied, the commission had noted that relator was driving a handicapped child to and from school even though he was only capable of driving with his left arm. As such, as early as the November 2000 SHO order denying relator's first application for PTD compensation, relator was on notice that the commission considered his act of transporting the handicapped child back and forth from school to be relevant. Also obvious is the fact that the commission itself was on notice that relator had been performing those activities. In fact, in the commission's statement of facts dated August 6, 2002, and prepared in response to relator's June 27, 2002 second application for PTD compensation, it was specifically noted that: "Injured worker has been and may still be a van driver for school." However, in spite of the fact that the commission itself was on notice that relator may still be driving the handicapped child to school, it appears that no one asked relator this question at the hearing.
 {¶ 28} As stated previously, it is clear from the medical evidence that relator's use of his right arm is extremely limited. While circumstances may necessitate him driving certain places, for instance to the grocery store, doctor's office, church, etc., the medical evidence is clear that relator is not qualified to drive for hire. Furthermore, the magistrate finds that the driving relator was doing, approximately 30 minutes before and after school, is not the type of "work" which most people would agree to do. Instead, it is most likely a retired individual who would perform the "work" involved herein, not to make money, but to get out of the house and feel like they were still a vital member of society. Also, since he was driving with his left arm, he was not engaged in activities inconsistent with his restrictions. The magistrate concludes this does not constitute sustained remunerative employment which would preclude the payment of PTD compensation.
 {¶ 29} Having resolved the issue in this case on the merits, the magistrate finds that it is unnecessary to address relator's constitutional challenges to the manner in which the BWC and the SIU handle investigations of this nature.
 {¶ 30} Because the commission had information before it that relator had been driving a handicapped child to and from school, because relator had every reason to accept that the commission was on notice about his driving, and because the magistrate finds that the activities of relator do not constitute some sustained remunerative employment of such a nature that PTD compensation would be not payable, the magistrate finds that relator has demonstrated that the commission abused its discretion in terminating his PTD compensation, declaring an overpayment, and finding fraud. Accordingly, it is the magistrate's decision that the commission's order should be vacated and that PTD compensation should be reinstated and paid to relator.